and Christopher Gibson, its appeal number 23-1655. Okay, we'll move to our seventh argument of the morning, Lorenzo Davis v. Billy Rook evening, Lorenzo Davis v. Billy Rook and Christopher Gibson, its appeal number 23-1675. The two claims here, the one with regards to Rook and the one with regards to Davis, are essentially different in that there is an issue with one where Mr. Gibson, Correctional Officer Gibson, was actually responsible for putting deadly weapons into F block, the cell block where Mr. Davis was confined with other individuals. Is there any evidence that those supplies were ever used to harm another inmate? No, there is no evidence in the record. I would acknowledge there is no evidence in the record that there was ever an incident like this previously. Then how could a reasonable officer have been on notice? There is a policy to check on those items and to make sure that they are not left in the cell block after they have been used for cleaning. But the purpose for that is because it is known that they can be used as deadly weapons. And not only that, but being a correctional officer, it doesn't stop you from using common sense. Anyone who has seen a mop or seen a broom and has seen a Bruce Lee movie or practically any violent movie has seen items like that used regularly. It is not a leap of the imagination that an individual could not possibly reach. In fact, it is something that would be absolutely reasonable to reach that if you are giving items such as mops and brooms, which are essentially a long staff or a club. If you are giving those to individuals, those individuals can use them in a violent manner. If we look at the standards with regards to the objective view that is now used rather than the subjective standards, which I guess are still used for inmates, but are no longer appropriate with regards to detainees, if you simply look at the first standard, the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined. It was not accidental that those cleaning supplies were put in. That is a standard, regular activity that is undertaken in that particular facility. Can you help me factually on a couple of things? Sure. I've tried to figure out for the life of me, where exactly did this altercation occur? And here's why I'm asking you that question. Mr. Davis testified that right before the attack, he was napping or trying to nap or something. And then he woke up and he saw Massey in his cell, and he thought Massey was trying to steal something. And they have an exchange of words after Massey came in his room, and not long thereafter, this attack occurs. Where did it happen? It is my understanding that the attack began. What's the record say? And this is my understanding of the record. But you have to understand that there are differences in what the different witnesses have said. All right. Tell us what you think the record says. And I believe that the record says, and this is my client's statement, that the altercation began in his cell and proceeded into the day room area. And when it got into the day room area, there were two individuals involved, Terrell Hibbler and Juanier Massey, both, and they were attacking my client. Okay. The second factual question is this. In your blue brief, you make a statement that, if accurate, would be very important. And my question is, is it accurate? You say on page 6 of your blue brief that the plaintiff, meaning Mr. Davis, reported the prior evening's threats, meaning the evening of April 11th. Correct. The prior evening threats to Defendant Gibson, a key correctional officer in this fact pattern. But your client testified in his deposition when asked specifically, do you know who you spoke to, or is it a fair statement, but you do not know who specifically you spoke to in terms of a correctional officer. Is that a fair statement? Answer, yeah, that's a fair statement. What in the factual record supports him reporting the April 11th threat or tension to Gibson? It is actually Gibson's testimony that I believe shows that. You know where? Well, Gibson states that he would only use one of the trustees to help, one of the inmates, if there was no other correctional officer helping him. And it is clear that he had one of the inmates helping him that morning. And although. That's not what you rely upon in your brief. In your brief, you rely upon the deposition of Mr. Davis to support that. I'm looking right at your brief. Your Honor, I must have been mistaken with regards to that. So in your view, Gibson testified that he acknowledged knowing of the tension? Gibson denied having that discussion. But Gibson also said that he only used the trustee when no other correctional officers were available. He did use a trustee. The trustee was there. He testified as well. I guess let me try it a different way. Where in the record are we relying on that he reported it to Gibson? That's where I'm just trying to find it. Looking in Gibson's deposition, Gibson testified that he was part of the handing out of breakfast and the putting the cleaning supplies into the F block cells. He also said that he only used the trustee when there was no other correctional officer available, and he did use a trustee that day. There was testimony that there may have been some other correctional officer. However, there is no knowledge on the part of any witness of what other correctional officer there might have been. No correctional officer. I think you have to add to that, too, though, your client's testimony that he testified he told somebody who was on duty. Yes, my client did know that he told somebody, but he could not identify who. But was it somebody at breakfast? I thought it was the night before. He did say the night before that he had told someone, but he also spoke to someone in the morning. He made two reports regarding the incidents that occurred. He reported the night before of threats, something along the line of he was going to get his butt whipped or something like that. Yes, because they asked him what he was in on. He wouldn't answer, and they threatened him, or at least that's what he said. But he was not clear on who he reported it to. No, the night before he was not, and he was not sure in the morning. But when you look at the testimony of Gibson and the trustee, it is clear that it had to have been Gibson that he reported it to in the morning. Wasn't the morning comment something different that he felt threatened? The morning comment was with regards to them stealing from him as well. But it was also about there having been problems the night before. I thought the morning comment was limited to a complaint that they were stealing from him and nothing suggesting he felt threatened. It was about breakfast. Didn't somebody steal his breakfast or something? Yes. Not about I feel threatened, but more they stole. Well, the way that one of the the way that it was characterized by my client, I believe he stated that he had referred to both of those, although it certainly was more about the stealing. And would you agree if it was if he complained to Officer Gibson about the stealing of his breakfast? That's not sufficient to put Officer Gibson on notice that he was at a high degree of risk that something might happen. Your Honor, I see at this point I'm down to my last minute. I will give you a question. Please answer the question. I actually do not think under the objective standard that it even matters. But would a reasonable officer I mean it does matter what a reasonable officer is told. And if a reasonable officer was told by an inmate that another inmate had stolen his breakfast, would you agree that is not sufficient to put a reasonable officer on notice that the inmate complaining about the stealing was at a high risk? Degree of risk. That alone, no, I would agree that is not. But you also would not give a gun to the inmate when you got that sort of notice, giving them some other dangerous weapons such as the mop or the broom. Still unreasonable, regardless of what the actual notification is. OK, very well, Mr. Atkins will hear from his sauce. Good morning, Your Honors. May it please the court. My name is Carrie has. I represent the defendants at police officer Billy Rook and Officer Christopher Gibson. In this case, the district court here correctly found that under the facts presented, Davis failed to establish that either officer acted unreasonably. I'd like to speak to Judge St. Eve's question with regard to what exactly was relayed in the morning or on the morning of April 12th, 2016. Mr. Davis's testimony taken in the light most favorable at this juncture did indicate not only that his breakfast had been stolen by other inmates, but his testimony is that he referenced the threat made from the night before. But that doesn't eliminate the identification problem that Davis has here. Davis testified he does not know who he reported the threat to the evening of April 11th. Likewise, he testified he does not know the officer. He reported the threat to the morning of April 12th, 2016. His specific testimony was it could have been two or three officers. None of the other inmates could identify Gibson as the officer who Davis made allegedly made the threat to. Is there a suggestion that in Gibson's declaration that he that he admitted that Davis spoke to him? No, there's no admission that Davis spoke to him and made any threats. I think what Gibson's testimony indicated was I don't recall if I had interaction with Mr. Davis that morning. But what he was unequivocal on was that Davis did not make any threats to safety to him that morning. Likewise, Gibson testified that Van Note, the hall worker in this case, did not inform him of any issues in FBOC. If he would have, he would have reported it to his sergeant. I want to first, I guess, turn to Officer Ruck because I think it's an important issue for this court to accept Davis's argument that Officer Ruck, who was the officer that responded to the fight at FBOC, somehow acted unreasonably because he waited for backup to arrive before entering the cell block to break up that fight. That's important. And Davis argues... Where did the fight happen? I want you to come back to your point. I apologize. Where exactly did the fight happen? Well, I will agree with Your Honor that there are two different versions. I think in the summary judgment order, the district court indicated that Davis went to Massey's cell, and that's where the fight started. But I think Davis's testimony was clear that Massey came into my cell, and that's where the fight started. But ultimately, they did all end up... It spilled out into the day room or something? Correct. Spilled out into the day room. So going back to Officer Ruck, Davis indicates, well, Kemp abrogated Guzman, Shields, Gutierrez, and somehow, now, one officer responding to a fight acts unreasonably if they don't go in there. I mean, that, to me, is a bridge too far, and I don't think that this court did that in Kemp. I think the court, of course, adopted the objective reasonableness standard under Kingsley and applied it to a failure to protect claim. But Kemp did not say that an officer shouldn't or cannot think of his own safety or her own safety before trying to break up. The plaintiff seems to back off of that a bit in the reply brief and suggest not that Officer Ruck should have gone in, but he should have taken some other measures like pounding on the wall or alerting the inmates that he was there. How do you respond to that? Well, none of that. Davis doesn't claim that any of those actions would have abated the risk, which I believe is the appropriate standard under both Kingsley and Kemp. I will also point the court to the cases I cited, Guzman, Shields, Gutierrez. All those cases say the officer acted reasonably even though the officer didn't take those same actions, Your Honor. There's a suggestion that there was a facility policy for Ruck not to intervene in the briefing, and so can we address that? Yes, so Ruck testified that per policy when he responded to the fight, he called for additional backup per policy and waited for the officers to arrive. There is no evidence in this record, Your Honor, that it was an extended wait for those officers to respond, and ultimately for the, I believe it was five officers plus Officer Ruck to go into the cell block and immediately break up the fight. The response was swift. So is there a policy that directs when intervention by the officer would have been permissible? The only evidence in the record is Officer Ruck's testimony about that policy. There was no, I don't believe, any discovery on a written policy. What's the record tell us about the exact amount of time that went by as a result of him radioing for backup and waiting before he intervened? It doesn't tell us, Your Honor. What I worry about is a different fact pattern where you have a group of inmates that are about mischief and feign a situation, feign a fight, and the 14th Amendment compels a guard to intervene in that only then to get badly hurt or killed because it's a ruse. I have a hard time believing that that's what the 14th Amendment requires. I agree, Your Honor, and Judge Chad had noted that in his summary judgment order. Right. Now, in fairness to the position Mr. Atkins is arguing, there may, you've got to be careful about going too far with what I said because there could be fact patterns where for one reason or another there's a delay with backup, and it really does become unreasonable not to try to protect an inmate. I agree, but— But all that suggests is that we should take the cases one at a time and see what happens because the fact patterns can be mighty different and the obligations could be different. Which Kingsley requires, the facts and circumstances of each case. And in this case, there is no evidence that, excuse me, there was an extended delay or any delay in these officers responding. Because one thing we do know about the record, correct, is there were multiple officers in or around F Block. It wasn't like Rook was the only one and people had to come from a totally different part of the facility. Well, Rook was the first one to respond. Right, and he walked in on the beat down, right? He did. Yeah. I do want to correct the record because in Davis's opening brief, I believe he describes it as an extended delay between the time Rook got there and the other officers arrived and they entered the cell block. There is no evidence to suggest that there was an extended delay. Even if there were, would that expose Rook to liability or would that expose Monell liability? If there's a delay in others coming to Rook's assistance, would that require Rook to go in alone when three inmates on a violent floor are fighting? I don't. I don't think that would require Rook to go in. I think we saw that in, correct me if I'm wrong, Guzman, where there was a 15 to 20-minute delay in the officers responding, and the court said in that case, while it's troubling, it's reasonable. In this case, we don't even have evidence to suggest there was a five-minute delay. Turning to Gibson, my understanding of Davis's argument, and if the court accepts that argument, it's creating a strict liability standard and essentially gutting the second and third prong of the cash flow test. I think what Davis is failing to appreciate is there has to be some type of notice to the officer in which the officer would appreciate the risk of placing those cleaning supplies unsupervised in the cell block. That is simply absent here. There was no— That's all right. Go ahead and just finish your thought, and you can wind down. There was no evidence of any past incidents in which cleaning supplies were used as weapons by inmates. Van Note, the hall worker who had been in and out of jail, indicated the same, and there was no specific threat that was communicated to Officer Gibson where Officer Gibson should have thought differently of putting the cleaning supplies in there. And I will just end with there's a long list of items in the jail that could be used as dangerous weapons in addition to cleaning supplies. Thank you. Ms. Haas, thanks to you. Mr. Atkins, yeah, come on back up. We'll give you a minute on rebuttal. Thank you, Your Honors. I'll make this very brief. I believe that the final statement that opposing counsel made actually underlines the issue for the court to decide. By her statements regarding the awareness of the officers rather than simply looking at whether their actions were reasonable, she shows the insidious nature of the subjective standard creeping back in after the Supreme Court and this court has made it clear that this is no longer a subjective issue. It is an objective one. It is a matter of reasonableness. It certainly could be relevant what a particular officer knows, don't you think? It would help you if you have evidence that a particular officer was put on notice of the risk. That certainly helps you. If the action is per se unreasonable, if you can look at it and see objectively that it is unreasonable, it doesn't matter what knowledge the officer had beyond simply knowing about what the facts were. The issue what opposing counsel has tried to bring back in is a subjective awareness on the part of the officer that has to do with what they're intending the facts to give rise to, the result. And that is no longer, as I understand the standards, part of the analysis. It is a matter of objective reasonableness. You're just saying apply what we wrote in Kemp. Right. Yes. Okay. And I just wanted to thank you, Your Honors, for your time on behalf of myself and my client for considering this case. Yeah, absolutely. You're quite welcome. Thanks to you, Ms. Haas. Thanks to you. We'll take the appeal under advisement.